**Assurance Co. of Am. v Chetrit Group LLC**

2025 NY Slip Op 30734(U)

March 4, 2025

Supreme Court, New York County

Docket Number: Index No. 150365/2016

Judge: Alan C. Marin

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK, Part 93

_____

ASSURANCE COMPANY OF AMERICA a/s/o
REEM BRIDALS, LLC, REEM HOLDINGS, LLC,
REEM ACRA BOUTIQUE LLC, R.A. LUXURY,
LLC,  REEM BRIDALS, LLC and REEM ACRA
BOUTIQUE LLC, [1]

        Plaintiffs,

      -against-

CHETRIT GROUP LLC, CORNELL REALTY
MANAGEMENT LLC, JCMC 245-247 LLC,
CORNELL 245-247 LLC, NORTH TRUE
CONSTRUCTION MANAGEMENT, LLC, MJR
CONSTRUCTION SERVICES CORP., and
MARGE NY INC.,

        Defendants.

_____

Index No. 150365/2016
Decision After Inquest
(Amended)

Alan C. Marin, Judicial Hearing Officer

Attorneys for Assurance Company of America
    Derrevere Stevens Black & Cozad
    By: Richard Freilich
       Robert Stern

Attorneys for Reem Bridals, LLC
    Amini LLC
    By: Bijan Amini
       Ariel Moore

_____

Reem Bridals, LLC has its principal design and production facility at 240 West 35th Street in Manhattan, using the entire seventh floor. Adjacent to plaintiff's building was a two-story building, 245-247 West 34th Street.

In January of 2014, defendants Chetrit and Cornell Realty, via JCMC and Cornell 245-247 as 50% co-owners, purchased the West 34 Street property intending to build a seventeen-story

_____

[1] The caption contains duplicate listings for Reem Bridals, LLC and Reem Acra Boutique LLC.

[* 1]

mixed-use building. The demolition work was contracted to defendants MJR Construction Services and Marge NY.

On March 27, 2014, two workers from MJR, Marge and/or North True Construction Management were using blow torches to cut through supporting I-beams just below the roof of the two-story building. A fire broke out, with dozens of fire trucks and a 100 firefighters responding to the scene. Trial testimony by fire marshal John Orlando and Michael Russo of TJ Russo Consultants explained how smoke from the fire spread into the upper floors of 240 West 35th Street. (PX-144, pages 329-340 and PX-143, page 114).[2]

* * *

Justice Lyle Frank, in March of 2024, issued orders granting default judgments to:

(i) Plaintiff subrogors (Reem Bridals, LLC et al) against The Chetrit Group LLC, Cornell Realty Management LLC, Cornell 245-247 LLC and MJR Construction Services Corp. (March 1, 2024, Nyscef document 707);[3] and

(ii) Subrogee Assurance Company of America against Cornell 245-247 LLC, North True Construction Management, LLC, and MJR Construction Services Corp. (March 25, 2024, Nyscef document 719; and see Assurance's Memorandum in Support of Assessment of Damages, page 4).

On March 11, 2024, the case went to trial against the remaining defendants, JCMC 245-247 LLC, and Marge NY Inc, both of whom settled the following week.[4] The other plaintiff-subrogors Reem Holdings, LLC, Reem Acra Boutique, LLC, and R.A. Luxury LLC) are not seeking damages here.[5]

Justice Frank referred the determination of the defaulters' damages to a judicial hearing officer. (Nyscef document 724). The undersigned was so designated on November 22, 2024. A conference was held on December 4 followed by the inquest hearing on February 5 and 11, 2025. Reem Bridals submitted a Pre-Hearing Memorandum by email on January 29 and Assurance, on February 11, emailed its memorandum on damages.

---

[2] "PX" stands for the exhibits of plaintiff Reem Bridals LLC; "S" for those of subrogee Assurance Company of America.

[3] Footnote 2 on page 2 of Reem Bridals' Pre-Hearing Memorandum: "Plaintiff did not obtain a default judgment against Defendant North True Construction Management and is thus not pursuing any claim against that Defendant at the inquest hearing."

[4] The trial went from March 11 to March 21, 2024 (Assurance's Memorandum, page 4).

[5] Footnote 1 on page 2 of Reem Bridals' Memorandum.

2

[* 2]

At the outset of the hearing, I read my email of November 25, which referred to the judicial hearin officer designation and proposed dates for a hearing.  A second email went out the next day scheduling the pre-hearing conference. It then added - -

> Let me note, in addition to the Derrevere Stevens and Amini firms, the following firms were sent the November 25 and 26 emails:
>
> Jason Levin of Jackson Lewis.
> Andrea Camacho of Camacho Mauro.
> John T. Hague of Hoffman Roth & Matlin, LLP.
> S. Skala of Tuttle Yick, LLP.
> Chris Fichtl of Pillinger Miller Tarallo, LLP.
> Eric Z. Leiter of Mauro Lilly Naparty, LLP.
> (I., page 4).[6]

Also placed on the record was: "I want to note from Mr. Amini and Ms. Moore's January 29th pre-hearing memo, page 5: 'All deadlines to retain counsel were ignored by the defaulting Defendants.' " (I., page 5; see also footnote 1 on page 4 of Assurance's Memorandum). Thus, the lawyers attending the damages hearing were from the two firms representing plaintiffs
.

\*     \*     \*

Reem Acra is the owner and chief executive of Reem Bridals, LLC. Ms. Acra founded her company in 1997, beginning with wedding gowns and adding ready-to-wear, mainly dresses, in 2003. Her first collection was covered by the New York Times and high-end stores like Saks Fifth Avenue and Nieman Marcus "caught on quickly" (I, page 52). Reem Acra's gowns and dresses are sold internationally, for example, at Harrod's of London. Ms. Acra testified that --

> These dresses are very unique. The original that I design, these are one of a kind handmade in the United States, New York City, they are a creation, not just a regular dress. (I., page 51).

A Reem Bridal wedding dress made the April 8, 2003 cover of *Women's Wear Daily*.(PX-24). Ms. Acra dressed Beyonce, Olivia Wilde, Taylor Swift early in her career; and at the inaugurations, Jill Biden, Melania Trump and Usha Vance.

This leads to an aspect of Ms.Acra's creations that is hard to miss - - their price. We learned, for example, that a Miss Universe contestant in 2010 wore a $110,000 Reem Bridals dress. In that

---

[6] Numerals I and II are used to cite the first and second days of hearing, followed by the page number. Note that my November 26 email included the following "Mr. [Jeffrey] Yick, you were added for your firm; the email to [S. Scala] was returned by Microsoft."

[* 3]

regard, the damage on the seventh floor was akin to one at a noted artist's studio or gallery handling her work.

*   *   *

Assurance Company of America used Robert Schlicht as its adjuster. Unavailable for the inquest, Mr. Schlicht's March 12, 2024 trial testimony was admitted as PX-141. Mr. Schlicht is a senior property general adjustor, and had been with Farmers Insurance for 18 years. Both Farmers and Assurance are subsidiaries of Zurich Insurance. (PX-141, pages 144 and 148; S-1, epages 9 and 209).

Mr. Schlicht arrived on site within a few days of the fire. The Reem Bridals space had a "heavy smoke and soot kind of smell . . .They had been cleaning for a couple of days, I believe, before I got there (*id.*, page 152) . . . [I] smelled smoke and saw soot damage." (*Id.*, page 157)

He referenced a schematic illustration of the seventh floor, with notations describing each functional area. (PX-13): "There was smoke and soot damage throughout all the areas, all the rooms" (PX-141, page 164). Mr. Schlicht took photos of the dresses and fabrics, testifying that "There was an odor to the fabric and on the dresses (*id.*, page 156) . . . patterns had smoke and soot damage." (*Id.*, page 158)

Robert Schlicht explained that he had adjusted about 20 to 30 claims in the couture fashion world, some of which had smoke damage. For this case, he retained two companies. CRDN, a textile and dry cleaning specialist, and RCF. The former looked "at all 2,400" dresses (*Id.*, page 187), CRDN had three or four people on site for a few days.

He hired RCF because "There was such a high volume of fabrics, so we hired them to do an inventory of the fabrics, to assess the damage, and to provide pricing." (*Id.*, page 166)

Mr. Schlicht was familiar with the firms, having used CRD 25 to 30 times and RCF on over a hundred claims. The two issued reports, upon which he relied:

> Q. Did you consider all fabric on the site a total loss?
> A. Yes . . .. it was new raw materials. The cleaning company also -- CRDN. So once you clean a new fabric, it's no longer new and . . . the cleaning process deteriorates the fabric, starts to break it down.
>
> Q. Could all the dresses have been cleaned
> A . . . But there was going to be a percentage that were not going to respond to cleaning. . . . And it would be impossible to know until they've attempted to clean them.
> (*Id.*, page 171)
> . . . .
> The cleaning company also mentioned that some of these dresses were going to have to be taken apart . . (*Id.*, page 176)

4

[* 4]

Mr. Schlicht was shown a document which refreshed his recollection that cleaning the dresses would cost 2.1 million dollars. The challenges of cleaning these one-of-kind dresses were significant:

> Just the different -- the amount of detail on the dresses, and you know, having to take some of them apart, and how would they respond. How would they hold -- how would the craftsmanship hold up to the cleaning process was a concern
>
> Even if the fabric did respond to the cleaning, the garment may
> fall apart, or start to come apart.
>
> Q    And I also recall that you said earlier in respect to cleaning the fabrics, the bolts of fabrics in the rooms, and if you cleaned them, she couldn't use them for making, quote, new  dresses.  Do I have that testimony correct?
> A    Yes.
>
> Q    And is that the same thing if you clean all those
> dresses, they wouldn't be new anymore would they
> A. Yes they wouldn't be.
> (*Id.*, pages 201-202).

In fact, Reem Acra testified that since 1997, she has never dry cleaned one of her dresses:

> Well, you know, dresses like this are not really made for dry cleaning . . .when you using silk or handmade things with ruffles and beading, number one they would could get oxidized. Two the silk will kind of fall down and get damaged . . . And it is impossible for anyone-- I could not sell them no matter how. (I., page 105).

This trier of fact concludes from the testimony and exhibits that the archive of 2,340 dresses, exposed to smoke and soot, was a total loss.

As Mr. Schlicht concluded, "With all this, we realized we were well above the policy limit [$2,461,600] just for those two categories, the cleaning of the library of dresses, and the fabrics. (PX-141, page 170). Exhibit S-2 (362 pages) includes an item-by-item analysis of the loss as well as invoices for fabrics, lace, sequins etc. Exhibit S-1 is the policy.

*        *        *

At the inquest, we heard from Joseph Manber, who has been chief financial officer and chief operating officer at Reem Bridals since 2017, and before that had decades of experience as CFO and/or COO of a number of companies. Mr. Manber was a matter-of-fact witness, with a sure grasp of the detailed exhibits on financial matters.

5

[* 5]

Mr. Manber did a physical inventory of all 2,340 archived dresses. He then calculated one average price for wedding gowns and dresses for 2012 and 2013. (See PX-135B). That average came to $8,335; which multiplied by the archive's 2,340 items yields $19,503.900 (See Mr. Marber's hearing testimony at I., page 41).

* * *

This exchange with Ms. Acra is on point:

> Q . . . [W]hy didn't you salvage the dresses? You got $40,000 for fabric. Why not sell these 2,340 dresses and get some salvage value and put money in your pocket for that?
> A.  I have my label. My label is on them. I would never put my name on anything that is not proper, you know, is ethical for me, I refused.
> (I., page 104)

In fact, the archive is preserved at a New Jersey warehouse for inspection if needed for litigation. (See footnote 8 at page 10, Reem Bridals Memorandum).

The documentary evidence is extensive and detailed; we have information on each of the 2,340 dresses in the archive. For example, PX-139, covers over 100 dresses, with design sketches, photos and client invoices. Not selecting, simply taking every 50 pages of the 288-page document, all stamped paid (except the last one):

> Item 999-828, first fitting July 28, 2010; invoice for $105,000  (page 1)
> Item 208214, March 19, 2013 invoice for $35,000 (page 51)
> Item 532-810, May 3, 2011 invoice for $13,000 (page 101)
>
> Item 542-909, June 21, 2012 invoice for $75,000 (page 151)
> Multiple items, December 23, 2013 invoice for a $250,000 wedding dress, with $12,500 and $30,000 each for the bridesmaids (page 201)
> Page 251 is a photo, only information on that page, "Sold: $25,000 Invoice # 1858"

As we saw, the prices of the gowns and dresses could go into six figures. No argument can be made that Reem Bridal is overreaching on damages for the lost archive  – they are using cost figures, and excluded from these are the cost of putting on fashion shows and public relations. As the pre-hearing memo indicated,

> The cost sought for the Design Archive does not include multiple other components inside the Design Studio that had to be discarded, including significant work in progress, historical patterns, hundreds of new pairs of shoes, expensive handmade imported embroidery, intricate handmade bridal veils, accessories and vintage dresses, to name a few. . . . recovery is not sought for these items based on the difficulty and expense of valuing them or reviewing the thousands of cost records . . . (Footnote 8).

6

\* \* \*

The damages claimed by Reem Bridals, LLC  has three elements: the loss of 2,340 gowns and dresses that were a part of its archives; the loss of thousands of yards of specialty cloth; and the cost of cleaning their seventh floor immediately after the fire.
`

PX-146 is a series of photos, mainly showing the bolts of fabric, rolled up and in swatch books. The evidence adduced was that the fabrics were valued at $75 a yard; lace at $80 a yard, resulting in a total loss of $1,356,146. One of the consultants had given a figure of $67 for fabrics, but this hearing officer accepts the higher number. Reem Bridals received $40,000 from a salvage company for the damaged fabrics (PX-140), with which Ms. Acra was willing to engage because the fabrics did not have her name.

Five days of cleaning the entire seventh floor was billed at $52,851 by Regency. The cleaning company's eight-page invoice included things like "4 Air Scrubbers @5 days per" and "chemical sponge." ( PX-27 ).

\* \* \*

In view of the above, the loss to Reem Bridals LLC was $20,912,897  ($19,503,900 plus $1,356,146 plus $52,851). Assurance paid Reem Bridals the $2,461,600 policy in four checks; one for $25,000 (dated April 1, 2014) and three $812,200 checks, dated May 14, 2014. (PX-148); the $40,000 salvage check was dated March 26, 2015 (PX-140)..

Ten years after the fire, Reem Bridals and Assurance each received $1,500,000 as their share of the settlement reached during the trial. At the hearing, Reem Bridal's counsel Bijan Amini had it as April 30, 2024 (II., page 42); Assurance's exhibit S-3 is a check dated April 24, 2024 to its counsel, which has to be turned over to the client etc. It is not unreasonable to use April 30, 2024 for both plaintiffs.

Lost or damaged property implicates pre-judgment interest. (*BVE Prods. Inc. v Saar Co., LLC*, 40 AD3d 349, 1st Dept). Counsel Richard Freilich convincingly explained that Assurance's recovery dates to the fire on March 27, 2014. As is said, the subrogee stands in the shoes of the subrogor; in line with that, the statute of limitations for an insurer begins to run from the date of the loss (*Allstate Ins. Co. v Stein*, 1 NY3d 416).

The $25,000 received about 6 weeks before the $2,436,600 (three times $812,200) can be merged into May 14, 2014. See, *BMF Media Group, LLC v Agora Visuals, LLC*, 2025 WL 431430 \*4 (Supreme Court, New York Co.), in which an amount one-sixth of that occurring six months later moved their total into one date five months later, per CPLR §5001 (b) - a "single reasonable intermediate date." Such does not result in any change here, because the $25,000 is about one/one-hundredth of the larger check, and the two are only 43 days apart.

There was some back-and-forth at the close of the second hearing day as to whether monies received are first credited against interest until the principal is reached, as was the view of the Office of the New York State Comptroller in Opinion 88-16. That opinion, like others, is from a

7

set of facts with monthly credits over a fairly significant period of time. In any event, the information above and my Order below allows the Office of the Chief Clerk to use the method as they deem appropriate.

In view of the foregoing, IT IS ORDERED that - -

* Plaintiff-subrogor Reem Bridals LLC is awarded:  (i) $20,912, 897 in damages against The Chetrit Group LLC, Cornell Realty Management LLC, Cornell 245-247 LLC and MJR Construction Services Corp., jointly and severally, with interest at the statutory rate from March 27, 2014, with $2,461,600 credited thereto on May 14, 2014, with $40,000 credited thereto on March 26, 2015, and with $1,500,000 credited thereto on April 30, 2024; and (ii) costs and disbursements.

* Plaintiff-subrogee Assurance Company of America is awarded (i) $2,461,600 in damages against Cornell 245-247 LLC, North True Construction Management, LLC, and MJR Construction Services Corp., jointly and severally, with interest at the statutory rate from March 27, 2014, with $1,500,000 credited thereto on April 30, 2024; and (ii) costs and disbursements.  .

This constitutes the Amended[7] Decision After Inquest of the Judicial Hearing Officer. Plaintiffs Reem Bridals, LLC and Assurance Company of America are directed to upload a proposed judgment and bill of costs upon the County Clerk who shall then enter judgment accordingly.

ENTER                                                                                          March 4, 2025

_____
Alan C. Marin,  Judicial Hearing Officer

---

[7] The sole change the amendment makes is to delete the misplaced period from the amount just after (i) in the preceding paragraph - - "$2,461,.600" is amended to "$2,461,600"

8

[* 8]